BUBBER CALHOUN v. THE STATE.

No. 5163. Decided June 25, 1919.

1.—Rape—Insufficiency of the Evidence.—Death Penalty.

Where, upon trial of rape by force, the evidence showed that the defendant was a colored man, and the prosecutrix a white woman, and the circumstances surrounding the alleged crime were such as to leave grave doubt upon the sufficiency of the evidence, a conviction for such offense, assessing the death penalty cannot be sustained.

**2.—Same—Motion for Rehearing—Reputation for Chastity.**

Where, upon trial of rape by force, there was no effort made on behalf of the State to produce any witness to testify in rebuttal of the evidence with regard to the reputation of the prosecutrix for chastity, truth and veracity, and that it was shown that prosecutrix associated constantly with negroes of both sexes, visiting with them, eating with them, and treating them on terms of equality, this court cannot sustain a conviction for rape by force inflicting the death penalty; especially where the State had opportunity to procure witnesses in rebuttal to these facts, and to show by other testimony direct or circumstantial that the offense was in fact committed. Following Sharp v. State, 81 Texas Crim. Rep., 256, 197 S. W. Rep., 209.

**3.—Same—Rape—Death Penalty—Excessive Verdict—Consent.**

Where, upon trial of rape by force, it appeared that the prosecutrix was of easy virtue, and associated indiscriminately with men both white and black, the defendant should have been permitted to show specific acts of immorality on the part of the prosecutrix, to affect her credibility and as bearing upon the question of consent. Following Bigliben v. State, 68 Texas Crim. Rep., 530, 151 S. W. Rep., 1044, and other cases.

Appeal from the District Court of Walker. Tried below before the Hon. E. A. Berry.

Appeal from a conviction of rape by force; penalty, death.

The opinion states the case.

*Hill & Hill,* and *Dean Humphrey & Powell,* for appellant.

*E. A. Berry,* Assistant Attorney General, and *J. A. Platt,* for the State.

On question of the sufficiency of the evidence, Short v. State, 36 Texas, 644; Edwards v. State, 78 Texas Crim. Rep., 210, 181 S. W. Rep., 195; Reeseman v. State, 59 Texas Crim. Rep., 430, 128 S. W. Rep., 1126; Tennell v. State, 78 Texas Crim. Rep., 400, 181 S. W. Rep., 458; Norwood v. State, 80 Texas Crim. Rep., 552, 192 S. W. Rep., 248; Waggoner v. State, 80 Texas Crim. Rep., 470, 190 S. W. Rep., 493; Warbington v. State, 80 Texas Crim. Rep., 394, 189 S. W. Rep., 147; Rose v. State, 79 Texas Crim. Rep., 413, 186 S. W. Rep., 202; Scott v. State, 79 Texas Crim. Rep., 474, 185 S. W. Rep., 994; Medlock v. State, 79 Texas Crim. Rep., 322, 185 S. W. Rep., 566; Summerville v. State, 79 Texas Crim. Rep., 184, 183 S. W. Rep., 439; Wood v. State, 78 Texas Crim. Rep., 654, 182 S. W. Rep., 1122; Duncan v. State, 79 Texas Crim. Rep., 206, 184 S. W. Rep., 195.

LATTIMORE, JUDGE.—Appellant was given the death sentence for rape of Mrs. Mattie Hallmark.

The occurrence is stated to have taken place at about 7:30 A. M. down in the big woods in the lower part of Walker County, Texas. The prosecutrix lived with her husband and three children in a logging camp; most of the people in said camp were negroes. Several

white witnesses who lived at said camp testified that prosecutrix associated mainly with the negroes and that the white people had very little to do with her; also that her reputation for chastity was bad; that she was seen in company with negro men who would stop at her house and from whom she would bum cigaretts and smoke, and laugh and carry-on. Her story of the rape was that on the morning it occurred, appellant came to her box car house and asked where the old boss was, meaning her husband and she told him he was at the corral. The corral was about one hundred yards from her house. A Mrs. Millwee, a white woman lived with her family about twenty steps from the prosecutrix. Further on beyond Mrs. Millwee's, about one hundred yards from prosecutrix, there lived a neego family; about 150 Yards in the other direction from prosecutrix there lived another negro family. She says that all these people were at home when the rape occurred. She testified that shortly after appellant came to her house and asked her about her husband that she went into the bushes near the corral to attend a call of nature. On her way back to her house, and when at a point about fifty or seventy-five yards therefrom, and in plain sight of her house, she says appellant appeared and that she saw he was going to catch her and she said: "Oh Lord, Richardson, run here quick." What tone of voice she said this in is not disclosed by the record. She further says that appellant told her to hush or he would cut her damn throat; that he had a knife and a stick; that he caught her this way (way not indicated), and put his other arm about her shoulders and carried her out into the woods and had sexual intercourse with her. She does not tell anything about resisting or refusing to have sexual intercouse with him after they got into the woods, but does say she resisted when he was carrying her or leading her out into the woods. She said after he accomplished his purpose he ran off, and that she went back to camp screaming; that on the way back to camp her husband met her. She also says that when she went into the bushes just before that, she left her three children in the box car, the oldest being a girl about twelve years old. The husband of prosecutrix testified that he was at work about one hundred yards from home that morning; that the first he knew of the trouble he heard his wife call him and he went to meet her and she told him a negro man overpowered her "and took it away from her." The sheriff of the county swore that the husband of the prosecutrix told him when he came there about eleven o'clock that his wife had been caught and slapped by a negro, but that the said husband told him that the negro did not accomplish his purpose. The husband denied making this statement to the sheriff. There is no suggestion from the husband that his wife was crying or excited or showed anything unusual in her appearance, or giving any of the other evidences naturally to be expected of a woman who had just been outraged, other than that he says he heard her calling. The next-

house neighbor, Mrs. Millwee heard and saw Mrs. Hallmark as she came back and there was not enough in her appearance or what she was saying to even cause Mrs. Millwee to go out where she was, nor was Mrs. Millwee on the stand asked to detail anything in her appearance or any statement that she made.  None of prosecutrix's clothes appeared to have been torn, and outside of her husband's statement that there appeared to be some bruises on her person, there was not anything in evidence to corroborate her in any way.  She says she walked part of the way down to the place where the act of intercourse took place.

It is truely remarkable that a woman physically strong weighing 120 pounds, and knowing herself to be in such easy calling distance of so many people, in the daytime, without apparently any tears or excitement, could be raped by a negro.

Appellant was without money or friends and the trial court appointed counsel to defend him.  He was given the death sentence and the case had been pending in this court many months when the writer of the opinion came upon the bench.  We have carefully considered the record in all its different aspects.  We are fully aware of the feeling that exists in the breast of every white man for the sanctity of the home, and the virtue of woman, when he hears that a black man is charged with an offense of this character against a white woman.  We believe that grave care should be exercised in such a case lest the judgment be swayed by passion.  The character of prosecutrix, the peculiar circumstances surrounding the case, the severity of the penalty, are matters that appeal to us with such force as to cause us to deem it best to let another jury pass on the facts.

The judgment is reversed and the cause remanded for another trial.

*Reversed and dismissed.*

ON REHEARING.

June 25, 1919.

LATTIMORE, JUDGE.—This case is before us upon the State's motion for rehearing, and it is strongly insisted that this court should either say that the evidence introduced in the trial court was insufficient, or that this motion should be granted and the judgment fixing the death penalty should be affirmed.  It is intimated in the arguments filed by the prosecuting officers in the court *a quo*, that all the evidence which might have a bearing upon this case was introduced on the former trial and that if such evidence does not sufficiently establish the guilt of the appellant that the case should be dismissed.  With the course taken by the prosecution after the

mandate is received by the court below, we have nothing to do. We make some suggestions as to evidence which might have been produced before the trial court. After the State closed its evidence, the appellant introduced witnesses who testified that the reputation of the prosecutrix was bad for chastity, truth and veracity. While it is disclosed from the record that the prosecutrix and her husband had lived in Ft. Worth, in Wichita Falls, and as one of them says "all around over the country," no effort was made on behalf of the State to produce any witness to testify in rebuttal of the evidence which is referred to with regard to the reputation of the prosecutrix. If we are to infer that the State does not desire or is unable to bring witnesses from any place to testify with regard to the good reputation of the prosecutrix, then we are in the necessary attitude of assuming that the State does not desire to combat the issue as to her reputation and that the same shall stand in this record as that of one who is admittedly of bad reputation in said respects. What we have just said with regard to the reputation of the prosecutrix for chastity, truth and veracity, appears to be true with regard to the fact of her association constantly with negroes of both sexes, visiting with them in their homes, eating with them at their tables and treating them on terms of equality both at her house and theirs. Notwithstanding the record makes it plain that there are other witnesses in the vicinity, both black and white, from which the State might produce evidence to combat this position, none were produced and we are in the attitude of again necessarily inferring that these facts are taken to be true. So that he have here a case in which a negro man is charged with a rape by force upon a woman of whom the State seems to admit that she is of bad reputation for chastity, for truth, and for veracity and one who is an habitual associate with the negroes of her neighborhood. Not only does this seem to be true, but the record shows that when the prosecutrix left her house a few minutes after the appellant was there, she left her three children, the oldest being a girl twelve years of age, in the house. A few steps away was another white family with five members and the testimony seems to indicate that they were at home. The oldest daughter of prosecutrix was on the stand as a witness but was not asked anything by either side as to the question of hearing any outcry from her mother either before or after the alleged rape or as to the appearance and condition of her mother's body or clothing after she returned from the scene of the alleged rape, nor were any of the other children placed on the stand. Notwithstanding the fact that there were three negro families living nearby and that the prosecutrix testifies that the next time she saw appellant after the alleged rape he was brought to her house by Will Harmon, her nearest negro neighbor, and apparently the first person who saw appellant after the alledged rape, Will Harmon, was not put on the stand by either side.

This is supposed to be a case of rape by force and against the consent of the prosecutrix, committed by a negro man whom she states on the stand she had never seen before that morning. The testimony of Sheriff King is pointed in stating that when he asked her who made the assault on her she said it was a negro whom she did not know but thought he was called Bubber, "I believe Bubber Calhound." The sheriff testifies that he put his dogs on the tracks at the place where the alleged assault and rape should have occurred and that the dogs trailed around and back to the house of Will Harmon, who, as stated above, was the negro neighbor living about one hundred yards from the home of prosecutrix. It was shown by the testimony that prosecutrix was on terms of friendly intimacy with the family of Will Harmon and we do not understand why his testimony was not before the jury. Flight is always regarded as evidence of guilt and if appellant returned to Will Harmon's house within a short time after the alleged rape and Will Harmon went with him from his house to the home of prosecutrix this would be a circumstance of much weight.

Again, prosecutrix testified that when she was approached by the appellant and he caught hold of her at a point about fifty or seventy-five yards from her house and in sight of her house, that she made an outcry, calling for her husband, and in reference to this outcry she testified she called as loud as she could and that it seemed to her that she could be heard by the people at the different houses. This was a very material matter and evidence should have been presented before the jury by the various people occupying these houses as to whether they heard such outcry. Again, it was a serious issue in the trial of the case, and the only one raised by the appellant, that there was consent in the case, on the part of the prosecutrix, to the act complained of. It was shown by the testimony of prosecutrix that her house was situated on the west side of the railroad tracks and that ranging west from her house there were no fields or houses or anything. The place to which she says she went was across the railroad tracks east, across the branch and past a pine thicket. She says she went there to attend to a call of nature. This court would like to have testimony in this rather remarkable case showing the condition of the ground, the timber, the nearness of places and opportunity for secreting one's self in the immediate vicinity of the home of prosecutrix as bearing upon the question as to whether her going to the place where she went was to a place reasonably convenient or usual for such purpose. Appellant appeared at the home of prosecutrix very early in the morning, a little before seven-thirty o'clock. She and her daughter contradicted each other as to what occurred there. Prosecutrix says that appellant called out and she went to the door, that he did not ask for her; the daughter says that when the appellant first approached that he asked for her mother and that she called her mother who came out. Any-

way, it is uncontroverted that a few minutes after the prosecuting witness went to a point in a pine thicket across the railroad tracks and across the branch fifty or seventy-five yards away from her house and that the appellant was there. On the question of force, we observe that while she says that he had a knife in one hand and a stick in the other that he did not strike her but put one arm around her shoulders and that in that position she and appellant went nearly four hundred yards east through a character of woods, together, that is not disclosed by the record and that ought to be made clear and plain. She says that she did not go willingly, that he forced her to go. What character of force he used is not disclosed by the record. The sheriff testified that from the point which her husband pointed out as the meeting of the two, the tracks of the man and woman walked side by side for about four hundred yards down in the woods. It is true that the sheriff says that the heels of the woman were sometimes dug in the ground as though she was holding back and he also says that at the distance of about four hundred yards the woman's feet seemed to go under a log and there were appearances of her being dragged along it. There is not a word in the record as to use of any threats or of any force or anything at all by the appellant after they reached the point in the woods testified about. We might digress here to say that appellant asked a special charge presenting the theory that even though there might not have been an encounter at first, yet if there was later and at the time of the rape, a consent, that the jury should acquit. Inasmuch as this was the only theory of the appellant and as the evidence was exceedingly slight, if not wholly wanting on the question of what occurred in the way of force at the place of the alleged rape, it seems to us that the charge should have been given.

The complaint made by the alleged female in cases of this kind soon after its occurrance has always been held to be a very material matter. Prosecutrix says that she told her husband what had occurred, as soon as she met him thereafter and he testified to the same fact, that she told him that a negro had taken it away from her'' and had outraged her, yet when the sheriff came soon after eleven o'clock he asked the husband if the negro had accomplished his purpose and says the husband told him ''She says not.'' Mr. King the sheriff thereafter, going down and looking at the place near the pine thicket where the parties seemed to have first met, says that it looked like two school boys had been having a scuffle there, and after looking at it he went back and asked the husband particularly if the negro had accomplished his purpose and the husband again repeated the statement that his wife said not, and himself told the sheriff that the purpose had not been accomplished. The sheriff then told him that there was something wrong about the matter and that if he was going to follow the negro and attempt to catch him, he wanted to know the facts and that he wanted to talk

with the woman. Thereupon the woman was brought out of the house by her husband who said to her that the sheriff wanted to know whether the negro accomplished his purpose, and she looked at the sheriff and the sheriff, as he stated on cross-examination, insisted that she tell him whether the negro had accomplished his purpose, and she then said "I hate to admit it, but he accomplished his purpose." This presents a direct contradiction between the statement of herself and her husband and that of the sheriff and is only one of the many contradictions that appear in this case. In the Blair case, 56 S. W. Rep., 622, Judge Brooks reversed where only a penalty of a few years was affixed because the prosecutrix told two tales about the occurrence. We did not discuss the facts extensively in the original opinion but we are firmly of the belief that the punishment fixed by the jury in this case was excessive under the circumstances. Our law permits the infliction of the death penalty as a punishment for crime, but only in the case of a very few offenses to each of which is affixed a punishment graded and ranging from a short term of confinement in the penitentiary up to the extreme penalty of death, which clearly indicates that it is not every case of rape or murder, or robbery that the lawmakers deemed shoud be punished by death.

We take it to be clear that the extreme penalty should only be inflicted in an extreme case and we do not believe this is such a case Our Constitution, section 13 of the Bill of Rights forbids the infliction of excessive fines or cruel or unusual punishment. Some of the earlier cases seem to hold that this court is without power to review the question of whether or not a punishment is excessive, but we do not think that position sound or justified by the language of either the Constitution or article 6, of our C. C. P., which is a re-enactment of said section of the Constitution. In the case of Roberson v. State, 25 Texas Crim. App., 111, this court held pointedly that the punishment fixed in that case was excessive and reversed the case for that reason. In the Inglen case, 36 Texas Crim. Rep., 472, this is the language used by this court: "We are of opinion that this court has no authority *under the circumstances of this case* to say that this verdict was excessive." In the Davis case, 4 Texas Crim. App., 456, this court uses the following language: "They having determined from the evidence that he was guilty, and there being no mitigating circumstances shown, nor anything to indicate that the jury were improperly influenced in affixing the amount of punishment within the limits of the law, the fine should not be set aside on appeal of the ground of excess." In the Handy case, 46 Texas Crim. Rep., 406, this court uses this language: *"We do not consider the verdict of the jury cruel or excessive,"* (citing authorities). In the Jobe case, 76 Texas Crim. Rep., 216, 173 S. W. Rep., 1625 the court first refers to the amount of punishment given and uses this language: "If he beat his wife the way she says he did, it would be

a little difficult for this court to say that this punishment was excessive. It was less than the maximum fixed by the statute." In the Sharp case, 81 Texas Crim. Rep., 256, 197 S. W. Rep., 209, this court uses this language: "This does not evidence that character of case which justified the death penalty."

It seems plain to us that if this court has the power and the right to say that there is not sufficient evidence to sustain the verdict of a jury, that then in a case in which the verdict of the jury has assessed the extreme penalty, of the law, that this court has unquestioned power to say whether or not, in its opinion, the facts in the case jusify the infliction of that extreme penalty. We have searched the books to see if any of the cases wherein there has been any holding which would seem to indicate a lack of power in this court to so decide were cases in which the extreme penalty of the law had been inflicted, and have found none.

We overrule this motion as we reversed the case in the original opinion, because we do believe under the facts and circumstances in this case that this verdict was excessive. We call attention to a bill of exceptions in the record taken by the appellant to the court's action in refusing to allow the witness Millwee to answer if he knew of any acts of specific immorality on the part of the prosecutrix. It is averred in the bill that if the witness had been permitted to answer this question he would have stated he knew of many acts of immorality on her part with men and that he would have said that he had known of said prosecutrix having intercourse with various men, and that it was her habit and custom to leave her home after her husband had left home and gone to work and spend most of her time in the woods with men and frequently negro men. That said witness would have further stated that it was the habit and custom of the prosecuting witness when engaged in having intercourse with various men to have her daughter, a child about twelve years of age, to act as lookout to keep her from being seen. It has been the holding of this court that evidence of specific acts of immorality was not admissible unless same bore upon some issue in the case. In the case of Bigliben v. State, 68 Texas Crim. Rep., 530, 151 S. W. Rep., 1044, Judge Harper held that the appellant should have been permitted to prove that the prosecutrix had been an intimate of a house of prostitution and had offered her body for sale publicly and that this fact ought to have been admitted as affecting her credibility in a rape case. It occurse to us that in a case where the record discloses without contradiction that the female associated on terms of equality with negroes around their homes and around her home that the appellant should have been permitted to prove that the prosecutrix frequently left her home and went to spend the day in the woods with negro men, and if the witness knew of his own knowledge, as appears from the said bill of ex-

ceptions, that she was in the habit of bestowing carnal favors indis-criminately upon men, that said witness might have been permitted to state that fact as it would certainly have had a very strong bearing upon her credibiliy as a witness in the case. And would have been a mitigating fact as bearing on the punishment. It has often been held by his court that the accused might prove prior and other acts of intercourse between himself and the prosecutrix in cases of rape as bearing upon the question of consent. While not called upon in this case particularly to discuss that question, this member of the court confesses his inability to see how instances of intercourse with the appellant on other occasions than the one charged would be admissible, as bearing on consent but instances of intercourse with men other than the appellant on other occasions would not be admissible, for any purpose.

The motion for rehearing is overruled.

*Overruled.*