

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00204-CR
### NO. 02-15-00205-CR

RIGOBERTO PANTOJA                                                    APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY
TRIAL COURT NOS. 1385575D, 1385577D

----------

## OPINION

----------

### I. INTRODUCTION

Appellant Rigoberto Pantoja pleaded guilty to the offenses of aggravated assault and attempted capital murder. A jury assessed his punishment at twenty years' confinement and sixty years' confinement, respectively, and the trial court sentenced him accordingly. Pantoja perfected this appeal, raising two issues: (1) the trial court abused its discretion by permitting the State to cross-examine

Pantoja's father concerning images on Pantoja's cell phone, and (2) the trial court erred by not granting Pantoja's motion for new trial because the sixty-year sentence Pantoja received constitutes cruel and unusual punishment. We will affirm the trial court's judgment for the reasons set forth below.

## II. FACTUAL AND PROCEDURAL OVERVIEW

One evening in September 2014, Pantoja gathered with friends to watch a prize fight involving Floyd Mayweather. After using alcohol and cocaine at the party and afterwards, Pantoja and some of his friends from the party ended up at a mobile home park in Mansfield, Texas. They were joined by a few individuals already at the mobile home park. This group included Pantoja, Luis Romero, Javier Martinez, Eduardo Vazquez, Francisco Curiel, and Hector Salinas. At around midnight, Pantoja started "talking crazy," pulled out a gun, and fired twice, striking Curiel in the face with one of the shots. Pantoja then put his gun to Salinas's head and pulled the trigger, but the gun was out of bullets so Pantoja pulled out a knife and stabbed Martinez three times in the neck. Pantoja then attacked Romero, cutting Romero's neck with the knife. The police and ambulance personnel arrived, and Curiel, Martinez, and Romero all survived their injuries.

After Pantoja pleaded guilty to the offenses of aggravated assault and attempted capital murder, the case proceeded to a jury trial on punishment. The State called twelve witnesses; Pantoja called four members of his family to testify on his behalf. They explained that Pantoja is a loving and caring brother, son,

2

and uncle. Pictures showing Pantoja in this capacity were introduced before the jury. Pantoja had filed an application requesting community supervision in both cases, and the jury was charged on that issue in both cases. As set forth above, the jury returned verdicts assessing Pantoja's punishment at twenty years' confinement and sixty years' confinement for the offenses of aggravated assault and attempted capital murder, respectively.

### III. Cross-Examination Regarding Images Found on Cell Phone

In his first issue, Pantoja asserts that the trial court should have sustained his objections to the State's cross-examination of Pantoja's father regarding images found on Pantoja's cell phone depicting "satanic, cocaine use, guns, and other prejudicial images." Specifically, Pantoja argues on appeal that these images had "no relevance whatsoever to the case" under Texas Rules of Evidence 401 and 402 and that the State's references to these images at trial "were highly and unduly prejudicial."[1]

### A. Pertinent Facts

Immediately before the defense called Pantoja's father Jose to testify, and outside the presence of the jury, the State indicated that it intended to cross-examine Jose regarding images obtained from Pantoja's cell phone. The

---

[1]Pantoja asserts that the images have "no probative value at all. It does not establish a material fact that relates to any element of the offense of attempted capital murder or aggravated assault nor to any disputed fact."

3

prosecutor explained that he had shown the images to defense counsel and summarized the issue to the trial court as follows:

> The content of the phone contained those photos, which I have shown to Defense counsel. So it's our argument, Judge, I believe, and Defense counsel even said it on opening, that he has a strong Catholic faith. And, you know, obviously, the angle with putting up family members is an argument that he is a good person. I believe Defense counsel intends, from what he showed me just briefly here, introducing some photographs in which are depicted items of his faith, and I think those are questions that Defense may intend exploring—areas that he may intend exploring.

> So it's become relevant on a number of levels. It's relevant certainly to punishment because of his character for being a peaceful, law-abiding citizen when you have depicted on his personal cell phone items of drug sales, drug use, as well as that of his counter to what Defense argument—what Defense has already raised, a strong Catholic faith, the items of satanic worship. So we believe that these are areas for proper exploration in cross-examination of his character witnesses and in punishment.

After further argument from defense counsel and the prosecutor, the trial court ultimately instructed the prosecutor to "whenever you are ready to ask the questions, approach up here and then I'll make a ruling at that time."

The jury returned to the courtroom, and the defense called Jose to testify. Jose testified on direct examination that Pantoja is his nineteen-year-old son. Jose testified that Pantoja lived at home with his parents. Pantoja worked and helped his parents with expenses and chores around the house. Jose said that Pantoja had never exhibited signs of violence and that he had no knowledge of any drugs or guns kept by Pantoja in the family's home. Jose identified photos that were admitted into evidence of Pantoja at his first communion with his two

4

sisters, of Pantoja's bedroom showing pictures of the Lady of Guadalupe and other saints hanging on the bedroom walls, and the car Pantoja used to drive with a rosary hanging off of the rearview mirror. Jose identified other family photos of Pantoja as a child and as an adult at the swimming pool with his nephew. Jose testified that he was surprised when he learned of this case involving his son and that he thought his son was not the person "who did that." He agreed that he tried to raise his son "better than that."

The State proceeded with its cross-examination of Jose and after several questions asked to approach the bench; the prosecutor obtained a ruling from the trial court that he could "ask [Jose] if he's aware" that Pantoja had pictures of drugs, guns, and satanic worship on his cell phone. The actual images from Pantoja's cell phone—State's Exhibits 67–78—were not admitted into evidence and are not part of the appellate record; the jury did not see them. Instead, on cross-examination of Jose, the State simply asked him to review State's Exhibits 67–78 and queried whether he was aware that his son kept pictures of cocaine, guns, other items associated with the use and sale of narcotics, and satanic worship on his phone. Jose answered, "No." The entire exchange before the jury is set forth below:

> Q. [PROSECUTOR]: Sir, I'm going to show you State's Exhibit 67 through 78, and I want you to look through these to—just look through them, if you could, please.
>
> THE COURT: Just look at them.

5

Q. [PROSECUTOR]: Now, sir, were you aware or did you know that your son kept pictures of cocaine, guns and other items associated with the use and sale of narcotics?

[DEFENSE COUNSEL]: Your Honor, I'm going to object at this time. There's—he's asking for facts that are not in evidence and, you know, he's asking is he aware. Still our objection is these things are unauthenticated; they're hearsay and irrelevant.

THE COURT: I'll overrule that objection. He can answer if he knows.

THE WITNESS: No.

Q. [PROSECUTOR]: Sir, were you aware that your son kept pictures of satanic worship on his cell phone?

A. No.

## B. The Law Concerning Cross-Examination of a Character Witness at Punishment

Article 37.07, section 3(a) of the Texas Code of Criminal Procedure governs the admissibility of evidence during the punishment phase of a noncapital case. *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008); *see* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a) (West Supp. 2015). Article 37.07, section 3(a)(1) provides that

> evidence may be offered by the [S]tate and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and . . . any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

6

Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1).  The definition of "relevant" as stated in rule 401 does not readily apply to article 37.07.  *Sims*, 273 S.W.3d at 295; *see Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009) ("Borrowing from the definition of 'relevant' in Texas Rule of Evidence 401 is of little avail because the factfinder's role during the guilt phase is different from its role during the punishment phase.").  Evidence is "relevant" to a punishment determination if that evidence will assist the factfinder in tailoring an appropriate sentence in a particular case.  *Sims*, 273 S.W.3d at 295; *see Henderson v. State*, 29 S.W.3d 616, 626 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) ("[T]he plain language of article 37.07, section 3(a) indicates that evidence of a defendant's conduct may be admissible even if the conduct does not constitute an offense or bad act.").  When a defendant requests community supervision—as Pantoja did here—a trial court may reasonably deem any character trait that pertains to the defendant's suitability for community supervision to be a relevant matter for the sentencer to consider.  *Sims*, 273 S.W.3d at 295.

When evidence of a person's character or character trait is admissible—as a defendant's character traits pertaining to his suitability for community supervision are when the defendant requests community supervision—such character traits may be proved by testimony about the person's reputation or by testimony in the form of an opinion.  *See* Tex. R. Evid. 405(a);[2] *Wilson v. State*,

_____

[2]Rule 405 is titled "Methods of Proving Character," and subsection (a)(1) provides:  "When evidence of a person's character or character trait is

7

71 S.W.3d 346, 349–51 (Tex. Crim. App. 2002). When character is proved by reputation testimony, a reputation witness is generally asked "have you heard" questions. *See Wilson*, 71 S.W.3d at 350 (citing *Reynolds v. State*, 848 S.W.2d 785, 788 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd)). When character is proved by opinion testimony, an opinion witness is generally asked "did you know" questions. *Id.*

The right of a party to cross-examine a character witness on specific instances of conduct as provided by Rule 405(a)—"[o]n cross-examination of the character witness, inquiry may be made into relevant specific instances of the person's conduct"—is subject to certain limitations. *Wilson*, 71 S.W.3d at 351; *Burke v. State*, 371 S.W.3d 252, 261 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd, untimely filed). First, the incidents inquired about must be relevant to the character traits at issue. *Burke*, 371 S.W.3d at 261 (citing *Wilson*, 71 S.W.3d at 351); *Murphy v. State*, 4 S.W.3d 926, 930–31 (Tex. App.—Waco 1999, pet. ref'd). Second, the alleged bad act must have a basis in fact. *Burke*, 371 S.W.3d at 261 (citing *Wilson*, 71 S.W.3d at 351); *Murphy*, 4 S.W.3d at 930–31. Before the questions are asked, the foundation for inquiring into the specific instances of conduct should be laid outside the jury's presence so that the judge will have an opportunity to rule on the propriety of asking them. *Burke*, 371

admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, inquiry may be made into relevant specific instances of the person's conduct." Tex. R. Evid. 405(a)(1).

8

S.W.3d at 261 (citing *Wilson*, 71 S.W.3d at 351); *Murphy*, 4 S.W.3d at 930–31. The party cross-examining the character witness may not offer extrinsic evidence to prove that the specific instances actually occurred. *Wilson*, 71 S.W.3d at 351. The purpose of the inquiry is to test the character witness and the basis of knowledge for her opinion, and the bad act is only probative for this reason. *Id.* (citing Fed. R. Evid. 405 cmt.).

## C. Standard of Review

A trial court's decisions concerning the admission or exclusion of evidence and concerning the extent of cross-examination are reviewed under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (concerning the admission or exclusion of evidence); *Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim. App.) (concerning the extent of cross-examination), *cert. denied*, 522 U.S. 994 (1997); *Walker v. State*, 300 S.W.3d 836, 843 (Tex. App.—Ft. Worth 2009, pet. ref'd) (concerning the extent of cross-examination). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1200 (1997).

## D. Analysis

Jose's testimony that he was surprised by the offense, that he did not think Pantoja had committed the offense when he heard about it, that Pantoja had not displayed violence at home, and that he was not aware of Pantoja's possession of drugs or guns at the family home, as well as Jose's sponsorship of numerous

9

photos connecting Pantoja to the Catholic church, constituted opinion character testimony of Pantoja's good character. *See, e.g., Burke*, 371 S.W.3d at 261 (holding mother's testimony that defendant was a "good boy" and "I know my son's heart, and I know he didn't do this" constituted opinion character testimony). Jose's character opinion testimony, elicited by the defense, was relevant and admissible at this punishment trial as evidence of Pantoja's character and character traits relevant to sentencing and pertinent to his suitability for community supervision. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (authorizing admission of opinion testimony of defendant's character as a matter relevant to sentencing); *Sims*, 273 S.W.3d at 295. That is, in determining an appropriate punishment for Pantoja and whether Pantoja could adequately complete the demands of community supervision, a sentencer might rationally want to take into account testimony of his good character and that he had a stable home life with no signs of violence, that he did not openly do drugs or possess guns at home, and that he possessed indicia of a religious upbringing. *See Sims*, 273 S.W.3d at 295 (explaining testimony that defendant lied to police officer relevant at punishment to determine ability to complete demands of supervision).

Because the defense sponsored Jose as a character-opinion witness, the State was entitled to cross-examine him through "did-you-know" questions about any relevant specific instances of Pantoja's conduct to test the basis of his good-character opinion of Pantoja and the basis of his opinions as to Pantoja's

10

character traits. *See* Tex. R. Evid. 405(a)(1) ("On cross-examination of the character witness, inquiry may be made into relevant specific instances of the person's conduct."); *Quiroz v. State*, 764 S.W.2d 395, 397–99 (Tex. App.—Fort Worth 1989, pet. ref'd) (holding State's "did-you-know" questions on cross-examination of defendant's character witnesses at punishment regarding defendant's relationship with his daughter and regarding his work were "clearly relevant" to request for probation when probation terms included supporting dependents and remaining employed); *Lancaster v. State*, 754 S.W.2d 493, 495–96 (Tex. App.—Dallas 1988, pet. ref'd) (holding State's "did-you-know" questions on cross-examination of defendant's character witness at punishment regarding whether witness knew of several offenses defendant had committed were relevant when witness testified that defendant was not a violent person and not a continuing threat to society).

The two "did-you-know" questions the State asked Jose on cross-examination were "did you know that your son kept pictures of cocaine, guns and other items associated with the use and sale of narcotics" and "were you aware that your son kept pictures of satanic worship on his cell phone?" The State laid the proper predicate for these two "did-you-know" questions by establishing outside the presence of the jury the factual basis for the specific instances of Pantoja's conduct questioned (possessing photos on his cell phone) and the relevance of Pantoja's possession of such photos (to Jose's opinion that Pantoja generally possessed a good character and to Pantoja's request for probation).

11

*See Quiroz*, 764 S.W.2d at 397–99. The prosecutor's question regarding cocaine, guns, and the use and sale of narcotics was specifically relevant to Pantoja's request for community supervision as pertinent to his ability to follow the terms and conditions of community supervision, if granted, including his ability to avoid committing an offense against the law, to avoid injurious or vicious habits, and to submit to testing for alcohol and controlled substances. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 11(a)(1)–(2), (14) (West Supp. 2015). And both questions were relevant as specific instances of Pantoja's conduct to test the basis of Jose's knowledge in forming his opinion that Pantoja possessed good character. *See Wilson,* 71 S.W.3d at 351 (explaining that the purpose of "did-you-know" cross-examination questions posed to a character witness is to test the witness's basis of knowledge for his opinion). Accordingly, we hold that the trial court acted within its discretion by permitting the prosecutor to cross-examine Jose, a character witness, during the punishment trial with two "did-you-know" questions regarding images found on Pantoja's cell phone. *See Burke*, 371 S.W.3d at 262 (applying abuse of discretion standard of review to alleged error in permitting prosecutor to propound "did-you-know" questions on cross-examination of defendant's mother who had testified for defense as a character witness).

We overrule Pantoja's first issue.

## IV. SENTENCE NOT CRUEL AND UNUSUAL

In his second issue, Pantoja asserts that the trial court should have granted his motion for new trial because the sixty-year sentence he received for the offense of attempted capital murder constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution and under article I, section 13 of the Texas constitution.  Pantoja raised this issue in the trial court by filing a motion for new trial that states, "Defendant believes the sentence is excessive and constitutes cruel and unusual punishment."  Thus, this issue is preserved for our review.  *See, e.g.*, *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (holding that to preserve disproportionate–sentencing complaint defendant must make timely, specific objection in trial court or raise the issue in motion for new trial); *Noland v. State*, 264 S.W.3d 144, 151–52 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (same); *Trevino v. State*, 174 S.W.3d 925, 927–28 (Tex. App.—Corpus Christi 2005, pet. ref'd) (same); *Papillion v. State*, 908 S.W.2d 621, 623 (Tex. App.—Beaumont 1995, no pet.) (holding defendant preserved cruel-and-unusual-punishment issue for appeal by asserting it in timely-filed motion for new trial despite failure to object at sentencing).

Pantoja acknowledges, however, that his sixty-year sentence for the offense of attempted capital murder is within the statutorily-authorized range of

five years to ninety-nine years or life confinement.[3]  And he acknowledges that Texas courts have traditionally held that so long as the punishment assessed is within the range prescribed by the legislature in a valid statute, the punishment is not cruel and unusual.  *See, e.g.*, *Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973); *Hammer v. State*, 461 S.W.3d 301, 303–04 (Tex. App—Fort Worth 2015, no pet.).[4]

Pantoja nevertheless points out that in *Calhoun v. State*, when a man was sentenced to death for rape, the court of criminal appeals held that the punishment was excessive even though it was within the statutory punishment range at that time.  214 S.W. 335 (Tex. Crim. App. 1919).  Pantoja "urges the court to apply the principles of *Calhoun* to his case and rule that the punishment

---

[3]*See* Tex. Penal Code Ann. §§ 12.04 (classification of felony offenses), 12.32 (first degree felony punishment range), 15.01 (criminal attempt), 19.03 (capital murder) (West 2011 & Supp. 2015).

[4]In *Hammer*, the appellant preserved his cruel and unusual punishment complaint solely via a motion for new trial, as did Pantoja here.  *See* 461 S.W.3d at 303.  We held in *Hammer*, however, that because the appellant offered no evidence in connection with his motion for new trial of sentences imposed for the same crime in the same jurisdiction and in other jurisdictions, "nothing in the record shows that the fifteen year sentence [for burglary of a habitation] constitutes a grossly disproportionate sentence or cruel and unusual punishment."  *Id*. at 304.  Consequently, even if we construed Pantoja's brief as requesting a disproportionality analysis in addition to his request that we simply apply and follow *Calhoun*, we would, for the same reasons set forth in *Hammer*, be unable to conduct such an analysis.  That is, the record before us contains no evidence regarding sentences imposed for attempted capital murder in this jurisdiction and in other jurisdictions, so nothing in the record shows that Pantoja's sixty-year sentence here constitutes a grossly disproportionate sentence or cruel and unusual punishment.  *See id*.

14

is excessive given [Pantoja's] age and all of the other factors of this crime." Because *Calhoun* is a 1919 case in which the death penalty was imposed, and because the United States Supreme Court, the Texas Court of Criminal Appeals, and this court have since issued decisions binding on this court concerning the disproportionate-sentence and cruel and unusual punishment analysis trial courts as well as this court are to conduct, we must decline Pantoja's invitation to apply *Calhoun* here. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 1004–05, 111 S. Ct. 2680, 2706–07 (1991) (Kennedy, J., concurring) (setting forth proportionality analysis); *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009–10, (1983); *Jordan*, 495 S.W.2d at 952; *Hammer*, 461 S.W.3d at 304; *Moore v. State*, 54 S.W.3d 529, 541 (Tex. App.—Fort Worth 2001, pet. ref'd).

We overrule Pantoja's second issue.

## V. CONCLUSION

Having overruled both of Pantoja's issues, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: WALKER, MEIER, and SUDDERTH, JJ.

PUBLISH

DELIVERED: June 9, 2016

15