Opinion filed May 22, 2025



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00032-CR
_____

## NIKOLAS TY MORENO, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 441st District Court**
**Midland County, Texas**
**Trial Court Cause No. CR57504**

## M E M O R A N D U M   O P I N I O N

A jury convicted Appellant, Nikolas Ty Moreno, of (1) murder, a first-degree felony, (2) tampering with physical evidence, a third-degree felony, and (3) theft of a firearm, a state jail felony. TEX. PENAL CODE ANN. §§ 19.02(b)(1), (b)(3), (c), 31.03(a), (e)(4)(C), 37.09(a)(1), (c) (West Supp. 2024). The jury assessed his punishment at (1) sixty years' imprisonment in the Institutional Division of the

Texas Department of Criminal Justice (TDCJ) and a fine of $6,000 for the offense of murder, (2) five years' imprisonment in the Institutional Division of TDCJ and a fine of $2,000 for the offense of tampering with physical evidence, and (3) twenty-four months' confinement in the State Jail Division of TDCJ and a fine of $2,000 for the offense of theft of a firearm. The trial court sentenced Appellant accordingly. In two issues on appeal, Appellant argues that the evidence is legally insufficient to sustain his convictions because he acted in self-defense and in defense of a third person, and that his sentence[1]constitutes cruel and unusual punishment. We affirm.

*Factual and Procedural Background*

Appellant and his younger brother N.M.[2] were staying with their paternal grandmother, Bahola Galindo. On July 30, 2021, Appellant went to work, then returned to his grandmother's house and, at around 10:30 p.m., Appellant and N.M. went to Santos Roman's house for Appellant to buy a THC pen. J.S., the fifteen-year-old victim, was at Roman's house when Appellant and N.M. arrived. According to Roman, J.S. knew both Appellant and N.M. The group was hanging out and smoking THC when Appellant offered acid to Roman and J.S. Roman declined, but J.S. took some of the acid. At around 11:30 p.m., Jonathan Bustillos was dropped off at Roman's house. Bustillos testified that he had known J.S. for about a year, and that evening, J.S. appeared "[n]ormal, happy, smile on his face like always." By 11:45 p.m. the group had decided to go to Al's Grocery to buy beer.

---

[1]Although he does not say which "sentence" that he refers to as being cruel and unusual, his arguments focus on Appellant's alleged efforts of self-defense in the protection of his brother that resulted in a cruel and unusual sentence. While the movement and hiding of the gun after the crime (tampering) and the original theft of the firearm have no apparent connection to Appellant's self-defense arguments, for the sake of completeness, we will assume that Appellant is referencing all three punishments as being cruel and unusual.

[2]Because N.M. and J.S. were minors at the time of the offense, we will refer to them using initials.

Appellant, N.M., and J.S. were in Appellant's single cab pickup, while Roman and Bustillos were in another vehicle with two of Bustillos's friends. Appellant was supposed to follow the other vehicle to Al's Grocery, but Appellant drove a different direction. Roman testified that Appellant and J.S. never arrived at Al's Grocery. Roman and Bustillos called J.S., and they agreed to meet at a nearby Stripes convenience store. Bustillos contended that J.S. still "seemed normal." Roman went to Stripes, but again Appellant and J.S. never arrived. Surveillance footage from Stripes that evening shows only one vehicle pulling up at 12:08 a.m. and departing after a few minutes. Roman and Bustillos eventually returned to Roman's house and tried several times to contact J.S., but he never answered. They learned later that morning that J.S. had been killed.

Shortly before 12:45 a.m., Midland Police Department (MPD) Officer Joel Covarrubio was dispatched to a residential neighborhood in response to a call of shots fired. Officer Covarrubio immediately made contact with N.M. Appellant was not present. N.M. told Officer Covarrubio that he had been driven to a house party by his friend Alex, they had been sitting inside his friend's vehicle outside the residence when they were shot at by three black men, and N.M. ran for help. N.M. could not provide the names or whereabouts of his other friends but stated that Appellant had been at home. Officer Covarrubio handcuffed N.M. and attempted to transport him to the location of the shooting where N.M. had allegedly fled from, but N.M. was unable to recall the precise location.

While Officer Covarrubio was preparing to release N.M. to his grandmother, Josie Rendon, Appellant came walking up the street to Officer Covarrubio and claimed that N.M. "had almost been hit by a car." Appellant informed Officer Covarrubio that there was a vehicle stuck in a ditch nearby and claimed that the

person responsible had been "on a bad acid trip," had had a gun, and had "la[id] shots on [Appellant]" inside Appellant's vehicle. Appellant then admitted to taking acid but stated that it had been unknowingly put into his drink. Officer Covarrubio testified that he was unable to get a coherent story from either Appellant or N.M. Officer Covarrubio's bodycam video depicting his interaction with Appellant and N.M. was played before the jury.

Appellant guided Officer Covarrubio to the location of the vehicle. There, Officer Covarrubio found a deceased male, later identified as J.S., lying face down on the ground outside of the passenger side of the vehicle. J.S. had sustained three entry gunshot wounds to his back with exit gunshot wounds located on the lower chest area, one gunshot wound to his left flank, and a gunshot wound to his right forearm. J.S. also had detectable amounts of THC and LSD in his system at the time of his death.

As Officer Covarrubio sought to secure the crime scene, Appellant was supervised by MPD Officer Liz-Aimee Guevara. Officer Guevara noted that Appellant was "very nervous," sweating profusely, unable to stand still, and appeared to be under the influence. Officer Guevara's bodycam video was admitted into evidence, and Appellant could be heard telling her that he had been driving when J.S. "started tripping off the acid" and tried to stab Appellant with a knife. J.S. reportedly then pulled out a pistol, "he shot it one time; it went off, like, accidentally" inside the vehicle, before shooting himself.

Appellant's story continued to change after he was taken into custody. Rosie Rodriguez, a former MPD Detective, testified that Appellant told her that he had given acid to J.S. earlier that evening at Santos's residence. Appellant confirmed that they had split up to get some beer but explained that he had stopped at Stripes

4

because he needed to vomit and use the restroom, and it was then that J.S. attempted to steal the vehicle and "ran over him -- or hit him with the vehicle." It is unclear how Appellant regained entry into the vehicle. At one point, Appellant described "diving" into the vehicle and clinging onto the door with his knees bent to his chest as J.S. drove, swerving around before colliding into a utility pole. At some unspecified point, J.S. fired a gun twice into the floorboard and drove off into a ditch. Appellant told Rodriguez that J.S. ultimately shot himself but later revised his statement to add that there was a second gun involved—one that had been in Appellant's waistband and that had accidentally discharged. Appellant would later go on to claim that he rendered first aid, and that J.S. had run out of the ditch. After the shooting, Appellant admitted that he hid the guns at his grandmother's house. Rodriguez testified that throughout the interview, Appellant appeared under the influence of something other than marihuana, and many of his statements to law enforcement ran contrary to the evidence recovered.

In some versions of his story, Appellant acknowledged that it was he that had a gun, and he claimed that his gun had fallen to the floorboard and that "it went off" when the vehicle crashed. Appellant said that he realized that neither he nor N.M. were shot, but that J.S. had been shot. Appellant insisted that all shots were fired inside of the vehicle and that he did not shoot J.S. He suggested that J.S shot himself. Appellant maintained that after the crash, J.S. ran out of the ditch. Appellant told N.M. to run to their Aunt Tanya's house to get help. Appellant said that he then took the guns from the scene and hid them at Galindo's house.

Detective Rodriguez testified that Appellant's story did not make sense. She continued to go back over his statement with him. She told him that she was going to the scene to corroborate his version of the events. When she returned, Detective

5

Rodriguez confronted Appellant with inconsistencies in his story. She explained that it was not possible that J.S. shot himself based upon the location of the gunshot wounds. According to Detective Rodriguez, the evidence was not consistent with Appellant's version that the gun had fallen to the floorboard and "went off." Detective Rodriguez also informed Appellant that the evidence did not support his contention that the bullet entered J.S.'s body from the front. Further, Detective Rodriguez determined that there was no way J.S. could have run away from the scene. According to Detective Rodriguez, Appellant's version of events was also inconsistent with that of N.M.

Appellant had no visible injuries except for a minor old bruise on his forearm and small cut above his right elbow. Similarly, N.M. had "red markings" on his right forearm and two light scratches on his right cheek. No bullet holes were observed in the floorboard of the vehicle or anywhere inside the vehicle. Meanwhile, spent shell casings were found on the mud outside the driver's door, on the driver's seat, and on the passenger floorboard of the vehicle. While no weapons of any kind were located on scene, two stolen guns, a Sig Sauer handgun and Taurus handgun, were later recovered from the house of Appellant's grandmother, Galindo, where Appellant and N.M. had been staying. Every cartridge casing and projectile recovered from the crime scene was determined to have been fired from a single handgun: the recovered Sig Sauer. Screenshots from the residence's surveillance camera were admitted into evidence, indicating that Appellant entered the home at 12:49 a.m.

Tanya Moreno, Appellant and N.M.'s aunt, testified that N.M. showed up at her house and said that there had been a shooting. Tanya called the police. At some point, Tanya saw Appellant walking toward her house coming from the direction of

6

Galindo's house. After the police arrived, Tanya and her sister left and went to Galindo's house to make sure that it was locked. Tanya's sister found a gun on the bed in the bedroom at Galindo's house where Appellant and N.M. were staying. Tanya called the police to come to Galindo's residence.

Texas Ranger Stephen Gray was called to the scene to assist in the investigation. Ranger Gray testified that an individual holding on to the driver's side door of the vehicle would suffer severe injury if the vehicle hit a utility pole as described by Appellant. Based upon his investigation, Ranger Gray opined that the person in the center seat of the vehicle was taking gunfire from the left side and possibly tried to get away from the gunfire by climbing to the right. Ranger Gray explained that the first shot was from the closest range and that the "rounds were getting more distant inside the truck," indicating that J.S. was trying to get away after the first shot. One gunshot went through J.S.'s body, exited, and then hit N.M.'s cell phone. That indicated that N.M. was in the passenger seat. Another gunshot exited J.S.'s chest and the projectile was located in between his chest and his shirt. Ranger Gray testified that, based upon his experience, J.S. was lying face down in the mud when that shot was fired, which appeared to be "an execution-type shot."

Ranger Gray further testified that in a self-defense shooting, the individual will usually call 9-1-1 as soon as it happened and even try to do CPR on the victim. The individual would want to try and tell "their entire story of what happened and why they did what they did." Ranger Gray noted that in this case no one called 9-1-1, EMS was not dispatched, and no one rolled the body over to perform CPR. Ranger Gray testified that the evidence indicates that there was a gun fight inside of the vehicle and that J.S. was not facing the gun fight because he was not shot in the

7

chest. J.S. appeared to be trying to get away from the gunfire. And that, when the vehicle stopped, J.S. was lying face down incapacitated when a final execution-style shot was fired. The blood evidence on the back of N.M.'s shirt was consistent with J.S. laying on N.M.'s back while bleeding. The blood evidence on Appellant's shirt was consistent with blowback from the gunshots. Ranger Gray concluded that the physical evidence showed that Appellant killed J.S.

Jeffrey Kelly, a firearm and toolmark examiner with the Texas Department Public Safety Crime Laboratory, testified that he conducted testing on both the Sig Sauer and Taurus handguns recovered from Galindo's residence. Kelley determined that all four projectiles recovered from the scene were fired from the same gun—the Sig Sauer.

Deputy Chief Medical Examiner Tasha Zemrus with the Tarrant County Medical Examiner's Office testified that J.S. had died of injuries to his lungs, heart, esophagus, stomach, liver, and spleen from multiple gunshot wounds. Dr. Zemrus testified that J.S. suffered five gunshot wounds—one in the back, two on the side of the left back, one on the left flank, and one in the right forearm. The gunshot wound in the upper back and the left flank were fired from intermediate range, which the medical examiner explained can be from a few inches to a few feet away from the body. J.S. had three exit wounds on his chest. The gunshot wounds indicated that the shots were fired from left to right with the gun behind and to the left of J.S.'s body.[3]

Appellant testified at trial that on July 30, 2021, at around 10:30 p.m., he and N.M. went to Roman's house so he could buy a THC pen. At Roman's house he

---

[3]Dr. Zemrus also confirmed that the entrance wound to J.S.'s right forearm could be "consistent with . . . a bullet entering, exiting, and then reentering his arm . . . [b]ecause all the shots are left to right."

saw J.S., but he had never met him before that night. Appellant and Roman smoked THC together, and then Roman asked for some acid. Appellant traded Roman acid for THC, but Roman sold the acid to J.S. Appellant heard J.S. say that he took the acid. After Bustillos arrived, they decided to go get beer. Roman asked Appellant to take J.S. with him and N.M. Appellant was driving, J.S. was in the center seat, and N.M. was in the passenger seat. Appellant was supposed to follow the others, but he knew a shortcut.

Appellant said that he had a tan Sig Sauer with him that night and that N.M. had a black and silver Taurus. J.S. asked N.M if he could see one of the guns, and N.M. gave him the Taurus. N.M. asked for it back, but J.S. wanted to hold it a little while longer. Appellant stopped on the side of the road "to use the restroom," and N.M. and J.S. began fighting over the gun. When he returned to the vehicle, Appellant tried to get J.S. off of N.M. Together, Appellant and N.M. were able to push J.S. out of the vehicle, and N.M. regained control of the gun. After they got J.S. out of the vehicle, Appellant and N.M. got back in and Appellant began to drive away. J.S. was able to jump into the back of the vehicle and was banging on the rear windshield. Appellant stopped the vehicle, got out, and walked toward the rear of the vehicle. J.S. then jumped down from the vehicle and got into the driver's side of the vehicle and took off.

Appellant was able to run back to the driver's side of the vehicle and pull himself partially inside of the vehicle. Appellant tried to push J.S. over, and N.M. attempted to grab the steering wheel. The vehicle was swerving out of control and hit a utility pole. J.S. said that he was going to crash the vehicle. The vehicle then left the road and went into a ditch. The vehicle came to a stop after hitting something. Appellant was able to open the door when he saw J.S. going for N.M.'s

gun. N.M. and J.S. again began to struggle for the gun, and Appellant hit J.S. in the back of the head to try and stop him. Appellant testified that J.S. said he was going to kill them. Appellant then pulled out his gun and told J.S. to stop. J.S. did not stop, so Appellant fired a shot. Appellant saw the gun in J.S.'s hand, so he shot him three more times. N.M. got out of the vehicle, and, according to Appellant, J.S. somehow got out of the vehicle as well.

Appellant told N.M. to look for a phone to call for help. A vehicle passed by, and Appellant screamed for them to call EMS. Appellant then told N.M. to run to Tanya's house for help. Appellant said that he did not want to lose the fingerprints on the gun or for anyone to take them, so he took the guns, wrapped them up in his shirt, and started running with N.M. N.M. went to Tanya's house, and Appellant took the guns to Galindo's house. Appellant put the guns on the bed and then tried to get help.

Appellant acknowledged that he was not truthful with Detective Rodriguez. He explained that he was scared and did not want to get himself or N.M. in trouble. Appellant admitted that he knew both the Sig Sauer and Taurus guns were stolen, but he insisted that he did not intend to rob J.S. Appellant said that J.S. was "tripping" and not acting normal. Appellant was afraid J.S. would kill N.M. or himself if he did not shoot him. He denied shooting J.S. in the back while J.S. was lying face down.

*Sufficiency of the Evidence*

Appellant first argues that the evidence is legally insufficient to sustain his convictions because he acted in self-defense and in defense of N.M. He concedes his guilt of theft-of-a-firearm charge, as he did at trial, and his brief contains no discussion of the tampering offense; therefore, we proceed with only a review of his

murder conviction.[4] *See* TEX. R. APP. P. 38.1(i); *see also Trollinger v. State*, No. 11-22-00089-CR, 2023 WL 5622111, at \*4 (Tex. App.—Eastland Aug. 31, 2023, no pet.) (mem. op., not designated for publication) ("Failure to either cite legal authority or advance arguments for the contentions made in an appellant's substantive analysis waives the issue on appeal.").

A. *Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Brooks*, 323 S.W.3d at 895; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As such, we must defer to the

---

[4]We also note the lack of a viable challenge to his tampering conviction on the basis of self-defense or defense of a third person under these particular circumstances. Those defenses relate to a person being justified in using force or deadly force against another in response to another's use or attempted use of unlawful force or unlawful deadly force and are inapplicable to the tampering offense. *See* PENAL §§ 9.31–.33 (West 2019). In this regard, a person commits the offense of tampering with evidence "if the person[,] . . . knowing that an offense has been committed, alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of or official proceeding related to the offense." PENAL § 37.09(d)(1); *Thornton v. State*, 425 S.W.3d 289, 300–01 (Tex. Crim. App. 2014); *Denny v. State*, 630 S.W.3d 253, 257 (Tex. App.—Eastland 2020, pet. ref'd).

factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. The *Jackson* standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we determine whether the necessary inferences are based on the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clement v. State*, 248 S.W.3d 791, 796 (Tex. App.—Fort Worth 2008, no pet.). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778. As the factfinder, the jury is "entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because [it] has the opportunity to observe the witness's demeanor and appearance." *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

The evidence need not directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is

sufficient to support the defendant's conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we treat direct and circumstantial evidence equally, and we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13. "Mental states are almost always inferred from acts and words" and "generally must be inferred from the circumstances under which a prohibited act or omission occurs." *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) (quoting *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)).

Self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's self-defense theory. *Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). For self-defense claims, the defendant has the burden of producing some evidence to support the claim. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *see also Saxton*, 804 S.W.2d at 913–14 (contrasting self-defense from affirmative defenses and explaining how burdens shift for self-defense). If the defendant produces some evidence, the State has "the burden of persuasion to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594. The State's burden does not require the production of any additional evidence; instead, "it requires only that the State prove its case beyond a reasonable doubt." *Id.*; *see Saxton*, 804 S.W.2d at 913. Therefore, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony"; rather, "we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the

essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Braughton*, 569 S.W.3d at 609 (quoting *Saxton*, 804 S.W.2d at 914); *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("[W]e review both legal and factual sufficiency challenges to the jury's rejection of such a defense under the *Jackson v. Virginia* standard.").

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." PENAL § 6.03(a) (West 2021). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2019). The use of deadly force against another is justified "(1) if the actor would be justified in using force against the other under Section 9.31; and (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary: (A) to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). In addition, a person is justified in using force or deadly force against another to protect a third person if, under the circumstances as the actor reasonably believes them to be, the actor would be justified in using force under Section 9.31 or deadly force under Section 9.32, to protect himself against the unlawful force or unlawful deadly force that he reasonably believes to be threatening the third person he seeks to protect, and he reasonably believes that his intervention is immediately necessary to protect the third person. *See id.* § 9.33. "The focus of

14

defense of a third person is upon what the actor reasonably believes concerning the situation of the third person." *Gonzales v. State*, 680 S.W.3d 358, 378 (Tex. App.—Eastland 2023, pet. ref'd) (citing *Morales v. State*, 357 S.W.3d 1, 8 (Tex. Crim. App. 2011)).

B. *Applicable Law*

We measure the sufficiency of the evidence by comparing the evidence produced at trial against "the elements of the offense as defined by the hypothetically correct jury charge." *Turley v. State*, 691 S.W.3d 612, 617 (Tex. Crim. App. 2024); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "The hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Turley*, 691 S.W.3d at 617 (citing *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019)). "The law authorized by the indictment consists of the statutory elements of the offense as modified by the indictment allegations." *Baltimore v. State*, 689 S.W.3d, 331 341 (Tex. Crim. App. 2024).

Here, Appellant was charged with J.S.'s murder under two theories: (1) intentionally or knowingly committing or attempting to commit the felony offense of aggravated robbery, and in the course and in furtherance of the commission and attempt to commit the felony offense of aggravated robbery, committing or attempting to commit an act clearly dangerous to human life by shooting J.S. with a firearm—felony murder; and (2) intentionally or knowingly causing the death of J.S. by shooting him with a firearm. *See* PENAL § 19.02(b)(1), (3).

15

C. *Analysis*

Appellant does not dispute that he shot J.S., but he argues that he "competently, credibly, and convincingly testified that had he not shot [J.S.] and had [N.M] not grabbed the steering wheel at the right time, Appellant and [N.M.] faced certain death or serious bodily injury." However, the only evidence supporting Appellant's theory of self-defense came from his own testimony, which the jury was free to disbelieve. *Valtierra*, 310 S.W.3d at 447; *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) ("Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.'" (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985))); *see also Muhammad v. State*, No. 11-17-00328-CR, 2020 WL 3127345, at *5 (Tex. App.—Eastland June 11, 2020, no pet.) (mem. op., not designated for publication) (noting that appellant's self-defense claim was inherently a credibility question for the jury to resolve where the only evidence of self-defense came from appellant).

Moreover, the record contains some evidence supporting the jury's apparent disbelief of Appellant's justification testimony. *See Braughton*, 569 S.W.3d at 611. There was no forensic evidence to support Appellant's contention that the other gun, the Taurus, allegedly possessed by N.M. and J.S. at the scene was ever discharged. There was a lack of evidence to indicate that the minor markings on Appellant or N.M. were defensive in nature. Appellant and his brother also each outweighed J.S. by more than fifty pounds, suggesting Appellant and his brother could have overpowered J.S. Further, it was undisputed that J.S. suffered from one gunshot wound inflicted at close range and an additional three entry wounds located on his back; Ranger Gray testified that this likely indicated that J.S. was attempting to flee

when he was shot and/or was shot while already lying on the ground outside the vehicle. Although Appellant testified that J.S. was the unprovoked, "high" aggressor, J.S.'s peers around J.S. prior to the shooting described J.S. as acting normal. In contrast, several officers noted that Appellant appeared to be under the influence immediately following the shooting. To the extent Appellant's statements contained some consistencies with other evidence collected and analyzed by law enforcement, the jury was not required to accept Appellant's claim and version of events as true simply because some evidence supported it. *See Barron v. State*, 630 S.W.3d 392, 404 (Tex. App.—Eastland 2021, pet. ref'd). Finally, the jury heard evidence that Appellant repeatedly changed his story when making statements to law enforcement, and Appellant admitted that he was untruthful because he did not want to get in trouble. The jury was not required to accept Appellant's version of events. *See Braughton*, 569 S.W.3d at 612.

As we have said, Ranger Gray testified that J.S. was shot execution style in the back while he was lying face down on the ground. Appellant contends that Ranger Gray's testimony "should have been rejected on its face" because his claims were "preposterous" and contradictory to the medical evidence. We disagree. The factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768. Ranger Gray testified that he had extensive experience in testing bullets and how bullets appear after hitting various objects. Based upon his experience, Ranger Gray determined that the shot fired into J.S.'s back was stopped by the soft mud where J.S. was lying face down. Ranger Gray further concluded, consistent with medical evidence, that the other shots were fired from the driver's side of the vehicle. Ranger Gray's testimony was

not so undermined by other evidence that the jury could not have rationally accepted any portion of it. *See Braughton*, 569 S.W.3d at 612.

In addition, Appellant's actions after J.S.'s death, such as flight, failing to render aid, failing to call law enforcement, and taking steps to hide evidence belie his claim of self-defense. *See Clayton*, 235 S.W.3d at 780 (noting that a factfinder may draw an inference of guilt from the circumstance of flight); *Patterson v. State*, 606 S.W.3d 3, 27 (Tex. App.—Corpus Christi–Edinburg 2020, pet. ref'd) (looking to appellant's post-murder conduct in assessing the sufficiency of the evidence supporting guilt); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (referencing flight from the scene of a crime as evidence a jury could consider in rejecting a self-defense claim).

Viewed in the light most favorable to the verdict, we conclude that there is sufficient evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Appellant committed the murder of J.S. and there is sufficient evidence in the record to support the jury's rejection of Appellant's claims of self-defense and defense of a third person. *See Baltimore*, 689 S.W.3d at 341; *Braughton*, 569 S.W.3d at 609, 613; *Saxton*, 804 S.W.3d at 914. We overrule Appellant's first issue.

## *Cruel and Unusual Punishment*

In his second issue, Appellant argues that his sentences are cruel and unusual in violation of the Eighth and Fourteenth Amendments of the United States Constitution. In this regard, Appellant contends generally that his sentence, which falls within the statutory punishment range, is "grossly disproportionate to the offense."

A. *Preservation*

An allegation of excessive or disproportionate punishment is a legal claim "embodied in the Constitution's ban on cruel and unusual punishment" and based on a "narrow principle that does not require strict proportionality between the crime and the sentence." *State v. Simpson*, 488 S.W.3d 318, 322–24 (Tex. Crim. App. 2016) (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)); *see* U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); *see also Meadoux v. State*, 325 S.W.3d 189, 193 (Tex. Crim. App. 2010) (acknowledging that the Eighth Amendment is applicable to the states by virtue of the Fourteenth Amendment (citing *Robinson v. California*, 370 U.S. 660, 666–67 (1962))).

"It is well settled that almost every right, constitutional and statutory, may be waived by the failure to object." *Smith v. State*, 721 S.W.2d 844, 855 (Tex. Crim. App. 1986); *see* TEX. R. APP. P. 33.1(a). "To preserve a complaint that a sentence constitutes cruel and unusual punishment, a defendant must first raise the issue to the trial court by a 'timely request, objection, or motion' stating grounds for the desired ruling and the trial court must either rule or refuse to rule on the request, objection, or motion." *Guillory v. State*, 652 S.W.3d 923, 929–30 (Tex. App.—Eastland 2022, pet. ref'd) (citing TEX. R. APP. P. 33.1(a)(1), (2)). An appellant may also preserve a sentencing issue by raising it in a motion for new trial. *Id.*; *see Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (holding that to preserve disproportionate-sentencing complaint, defendant must make timely, specific objection in trial court or raise the issue in motion for new trial); *Pantoja v. State*, 496 S.W.3d 186, 193 (Tex. App.—Fort Worth, 2016, pet. ref'd) (holding that issue of cruel and unusual punishment was preserved when raised in a motion for

new trial); *Reynolds v. State*, 430 S.W.3d 467, 471 (Tex. App.—San Antonio 2014, no pet.) (same); *see also, e.g.*, *Noland v. State*, 264 S.W.3d 144, 151–52 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Trevino v. State*, 174 S.W.3d 925, 927–28 (Tex. App.—Corpus Christi–Edinburg 2005, pet. ref'd); *Papillion v. State*, 908 S.W.2d 621, 623 (Tex. App.—Beaumont 1995, no pet.) (holding defendant preserved cruel-and-unusual-punishment issue for appeal by asserting it in timely filed motion for new trial despite failure to object at sentencing).

Appellant did not object that any sentence was cruel, unusual, disproportionate, or excessive when the trial court pronounced the sentence, nor did Appellant object in a motion for new trial. Therefore, Appellant's issue was not preserved for our review. *Renfroe v. State*, 529 S.W.3d 229, 233 (Tex. App.—Eastland 2017, pet. ref'd) (collecting cases); *see* TEX. R. APP. P. 33.1(a).

B. *Analysis*

Even if Appellant had preserved his Eighth Amendment claim, we conclude that none of his sentences are grossly disproportionate to the offenses. Punishment is generally not considered to be violative of the Eighth Amendment if the sentence imposed falls within the statutory range of punishment for the offense for which the defendant was convicted. *Simpson*, 488 S.W.3d at 323; *Sneed v. State*, 406 S.W.3d 638, 643 (Tex. App.—Eastland 2013, no pet.); *see Wood v. State*, 560 S.W.3d 162, 168 (Tex. Crim. App. 2018) ("[The appellant's] life sentence, which falls within the punishment range for attempted capital murder, is not an illegal sentence."). However, a narrow exception to this rule exists: when the sentence imposed is grossly disproportionate to the defendant's convicted offense, it may violate the Eighth Amendment, even if it is within the offense's statutory range of punishment. *Renfroe*, 529 S.W.3d at 233 (citing *Solem v. Helm*, 463 U.S. 277, 287 (1983)); *Sneed*,

406 S.W.3d at 643; *see Simpson*, 488 S.W.3d at 322. Nevertheless, "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare." *Solem*, 463 U.S. at 289–90 (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)); *Simpson*, 488 S.W.3d at 322–23 ("[A] sentence is grossly disproportionate to the crime only in the exceedingly rare or extreme case." (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003))).

To evaluate the proportionality of a sentence, the first step is to make a threshold comparison between the gravity of the offense for which the defendant was convicted, and the severity of the sentence imposed. *Simpson*, 488 S.W.3d at 322; *Renfroe*, 529 S.W.3d at 234; *Alvarez v. State*, 525 S.W.3d 890, 893 (Tex. App.—Eastland 2017, pet. ref'd). When we analyze the gravity of the offense, we review the harm caused or threatened to the victim, the culpability of the offender, and the offender's criminal history. *Simpson*, 488 S.W.3d at 323; *Renfroe*, 529 S.W.3d at 234. However, if we do not find a gross disproportionality, our analysis ends there. *See Harmelin*, 501 U.S. at 1005; *Renfroe*, 529 S.W.3d at 234 (citing *Bradfield v. State*, 42 S.W.3d 350, 353–54 (Tex. App.—Eastland 2001, pet. ref'd)). Only if the sentence is grossly disproportionate to the offense, must we then compare Appellant's sentence with the sentences received for similar crimes in this jurisdiction or in other jurisdictions. *Bradfield*, 42 S.W.3d at 353–54.

Appellant was convicted of a first-degree felony, third-degree felony, and state jail felony and was subject to the following punishment ranges: The punishment range for a first-degree felony offense is either imprisonment for life or for any term of not more than ninety-nine years or less than five years, and a fine not to exceed $10,000; the punishment range for a third-degree felony offense is imprisonment for a term of not more than ten years or less than two years, and a fine not to exceed

$10,000; and the punishment range for a state jail felony offense is confinement in a state jail for more than two years but less than 180 days, and a fine not to exceed $10,000. PENAL §§ 12.32, 12.34, 12.35(a), (b). In this case, the jury assessed Appellant's punishment at sixty years' imprisonment and a fine of $6,000; five years' imprisonment and a fine of $2,000; and twenty-four months confinement and a fine of $2,000, respectively.

The legislature is vested with the authority to define criminal offenses and to prescribe the applicable punishment for each offense. *See Harbin v. State*, 619 S.W.3d 293, 296 (Tex. Crim. App. 2021); *State ex rel. Smith v. Blackwell*, 500 S.W.2d 97, 104 (Tex. Crim. App. 1973). Here, Appellant's sentences fall within the applicable punishment ranges prescribed by the legislature for the offenses for which he was convicted, i.e., murder, tampering with physical evidence, and theft of a firearm. Although the jury heard evidence of Appellant's abusive father, neglectful mother, and mental health struggles, and Appellant was repeatedly described as being a helpful and respectful individual, we weigh heavily the circumstances and gravity of these offenses and the substantial harm resulting from Appellant.

The jury found that Appellant shot and killed J.S., who was fifteen years old at the time. The offense is a violent and serious offense, aggravated by the evidence that the shooting was execution style in nature. *See Alvarez*, 525 S.W.3d at 893; *Sneed*, 406 S.W.3d at 643. Appellant admitted that the gun he used to kill J.S. was stolen, and he admitted that he removed the firearms, wrapped them in his shirt, took them to his grandmother's house, and hid them in a bed under a blanket, which actions the jury was free to conclude were with intent to impair the availability of the firearm from being used as evidence in an impending investigation or official proceeding. *See Nguyen v. State*, No. 11-21-00095-CR, 2022 WL 17997087, at *3

(Tex. App.—Eastland Dec. 30, 2022, no pet.) (mem. op., not designated for publication) (citing *Lumpkin v. State*, 129 S.W.3d 659, 663 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd), and *Ochoa v. State*, No. 07-18-00045-CR, 2019 WL 1870108, at *4 (Tex. App.—Amarillo Apr. 25, 2019, no pet.) (mem. op., not designated for publication)); *Stahmann v. State*, 548 S.W.3d 46, 58 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573 (Tex. Crim. App. 2020). After reviewing the facts and circumstances surrounding the offenses within the record, we find nothing to indicate Appellant's sentences were grossly disproportionate to those offenses.

Moreover, at the punishment stage of trial, Appellant was implicated in an extraneous offense, a burglary, when he and others entered a residence to steal several items, including guns. *See Simpson*, 488 S.W.3d at 323. Appellant's conduct following his arrest and release on bond for the instant offenses is likewise concerning. *See id.* Appellant was arrested for possession of a dangerous drug on July 25, 2023, following a traffic stop after an officer witnessed Appellant swerving into incoming traffic. Three months later, on October 17, 2023, Appellant was arrested for possession of a controlled substance (fentanyl), possession of drug paraphernalia, and failure to identify after officers responded to a dispatch call concerning an unwanted subject at a hotel who was yelling and hitting the walls. Appellant was again arrested for possession of a controlled substance and possession of drug paraphernalia on December 4, 2023.

We hold that Appellant's sentences are not grossly disproportionate to the offenses, and therefore do not constitute cruel and unusual punishment. *See Sneed*, 406 S.W.3d at 644. As here, if we do not find a gross disproportionality, our analysis ends. *Renfroe*, 529 S.W.3d at 234 (citing *Bradfield*, 42 S.W.3d at 353–54). Thus,

while Appellant provided none, we need not compare sentences received for similar crimes in Midland County or in other jurisdictions to his sentence. *See Bradfield*, 42 S.W.3d at 353–54. We overrule Appellant's second issue.

*This Court's Ruling*

We affirm the trial court's judgments.

W. BRUCE WILLIAMS
JUSTICE

May 22, 2025

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.